## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DeEnterprises, INC. | |
| Plaintiff, | **Civil Action No. 1:19-cv-06540** |
| v. | **COMPLAINT** |
| VIKING PACKAGING TECHNOLOGIES, INC. d/b/a VIKING MASEK GLOBAL PACKAGING TECHNOLOGIES, | **JURY TRIAL REQUESTED** |
| Defendants. | |

Plaintiff, DeEnterprises, Inc. for its complaint against Defendants Viking Packaging Technologies d/b/a Viking Masek Global Packaging Technologies alleges as follows:

### NATURE OF LAWSUIT

1.     This is an action for: (I) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act pursuant to 815 ILCS 505; (II) Fraud, (III) Breach of Fiduciary Duty, (IV) Constructive Fraud, (V) Negligent misrepresentation, (VI) violation of the Wisconsin Deceptive Trade Practices Act pursuant to Wis. Stat. Ann. § 100.18, (VII) Breach of Contract, (VIII) Breach of Express Warranty pursuant to 810 ILCS 5/2-313, (IX) Breach of Implied Warranty of Fitness for a Particular Purpose pursuant to 810 ILCS 5/2-314, and (X) Contract Rescission pursuant to 810 ILCS 5/2-209.

### THE PARTIES

2.     DeEnterprises, Inc. ("DeEnterprises") is an Illinois corporation having its principal place of business at 1050 Atlantic Drive, West Chicago, IL 60185-5101.  DeEnterprises is a family owned "mom and pop" company who makes innovative nail and pedicure products and sells its products to distributors within the professional nail industry.

3. On information and belief, Defendants Viking Packaging Technologies doing business as Viking Masek Global Packaging Technologies (collectively, "Viking") is a Wisconsin corporation with its principal place of business located at 40 Woodland Court, Oostburg, Wisconsin, 53070, and purports to be a manufacturer of premade pouch packing machines, baggers, and multilane stick pack and sachet packaging machines. (*See* https://vikingmasek.com/about-us).

## JURISDICTION

4. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5. This Court has personal jurisdiction over Viking pursuant to 75 ILCS 5/2-209, because it transacts business in Illinois and a substantial part of the fraud, tortious acts, solicitations, and omissions giving rise to the claims in this action occurred in this District.

## VENUE

6. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the fraud, tortious acts, solicitations, and omissions giving rise to the claims in this action occurred in this District.

7. The "Original Contract" between Viking and DeEnterprises dated August 9, 2018 contained a "permissive" forum-selection provision that recites in applicable part that:

> … The courts of Sheboygan County Wisconsin will have jurisdiction to entertain and determine all disputes and claims both at law and in equity arising out of or in any way connected with the validity, existence, enforceability, construction, breach or alleged, threatened or anticipated breach of this Contract…

(*See* Ex. A, Original Contract, p. 10, para. 9).

8. On information and belief, Viking had a contract with third-party Summit Foods, Inc. that included an identical "permissive" forum-selection provision that recited in applicable part that:

> … The courts of Sheboygan County Wisconsin will have jurisdiction to entertain and determine all disputes and claims both at law and in equity arising out of or in any way connected with the validity, existence, enforceability, construction, breach or alleged, threatened or anticipated breach of this Contract…

(*See* Original Contract, Ex. A, p. 10, para. 9; *compare*, Ex. D, *Summit Foods, Inc. v. Viking Packaging Techs., Inc.*, No. 3:18-CV-1470-SI, 2018 WL 4690364, at *3 (D. Or. Sept. 28, 2018).

9. In *Summit Foods, Inc. v. Viking Packaging Techs., Inc.*, the U.S. District Court for the District of Oregon held that the forum-selection clause in the Viking contract is "permissive" and not mandatory, because it merely shows that the parties have consented to jurisdiction in a particular locale, but the provision does not preclude litigation elsewhere. *See* Ex. D, *Summit Foods, Inc. v. Viking Packaging Techs., Inc.*, No. 3:18-CV-1470-SI, 2018 WL 4690364, at *3-4 (D. Or. Sept. 28, 2018). And, collateral estoppel prevents Viking from contesting that the forum-selection provision in its "terms and conditions" is permissive since it litigated and lost on that issue.

10. The second contract between Viking and DeEnterprises ("First Change Order") dated October 10, 2018 did not include any forum-selection provision or incorporate any terms or conditions from the Original Contract. The only terms for First Change Order contract were "100% [payment] prior to ship." (*See* Ex. B, First Change Order).



11.     The third contract between Viking and DeEnterprises ("Second Change Order") dated October 26, 2018 did not include any forum-selection provision or incorporate any terms or conditions from the Original Contract or the First Change Order contract.  The only terms for Second Change Order contact were "100% [payment] prior to ship."  (*See* Ex. C, Second Change Order).



12.     Since (a) the forum-selection clause in the Original Contract is "permissive" and not mandatory, (b) Sheboygan County Wisconsin resides in the geographical boundaries of the U.S. District Court for the Eastern District of Wisconsin, and there is no federal court located within Sheboygan County Wisconsin (*see, e.g.,* https://www.wied.uscourts.gov/); (c) the courts of Sheboygan County Wisconsin do not have jurisdiction over—at least—the Illinois causes of action; and (d) neither of the other two contracts (*i.e.*, the First Change Order and the Second Change Order) contained forum-selection provisions, DeEnterprises is entitled to bring this action in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the fraud, tortious acts, solicitations, and omissions giving rise to the claims in this action occurred in this District.

## DETAILED FACTUAL ALLEGATIONS PER FED. R. CIV. P. 9(b)

13.     During the summer of 2016, DeEnterprises recognized an up and coming opportunity in the pedicure industry. At the time there were only a couple of companies producing small single-use pedicure packets otherwise known as sachets. Typically, they were sold as a package that contained a separate product in its own sachet for each step in a pedicure process. For example, the DeEnterprises' Pedicure Packet System includes: "Pack 1" for a foot soak to soften and clean a foot, "Pack 2" for a sugar scrub for exfoliation, "Pack 3" for a marine mask to repair the skin, and "Pack 4" for a massage butter for protecting and rehydrating the skin. (*See, e.g.,* https://www.deenterprises.com/pedicure-packet-system-pages-104.php). In order to package the products, each sachet has to be filled with its applicable cream, gel, or granular powder.



14.     DeEnterprises officially started selling its Pedicure Packet System in August 2016. Within a couple months, DeEnterprises sales had reached the physical limit they could produce at their location.  In December 2016, they relocated to a larger building where they dreamed of the opportunities they could chase with more space. By the end of 2017, with approximately 300,000 packets having already been sold, DeEnterprises knew that automation was going to be required to keep up with growth.

15.     DeEnterprises knew they needed a sachet machine to automate their process, but it was unclear what type would be the best for their specific products. The physical characteristics of the 4 DeEnterprises products vary greatly:  the foot soak of "Pack 1" is a damp salt, the sugar scrub of "Pack 2" is a thick gel with suspended sugar granules, and the cream mask of "Pack 3" and the massage butter of "Pack 4" are thick lotions.   Since the physical characteristics are so different, DeEnterprises had no idea what type(s) of machine(s) would be needed and whether one or multiple machines would be required for automation.

16.     Automation equipment is expensive and resources on the Internet are somewhat limited. Determining the correct machine for the task required expertise and experience that they did not have.  Since this would be the largest investment in this small company's history, there was an immense amount of pressure to find the right company to guide DeEnterprises through the process of entering the world of automation including, but not limited to: (a) analyzing all of DeEnterprises' automation needs for the four products, (b) designing machine(s) to handle all automation, (c) specifying equipment and components for the machine(s), (d) sourcing the equipment and components for the machines(s), (e) testing the equipment and components as well as working with vendors to ensure that everything would operate correctly to produce sachet packets per the necessary DeEnterprises' specifications, (f) assembling the equipment and components into the machine(s), (g) delivering a machine that would do everything that DeEnterprises needed, and (h) providing local technical support and customer service for the machine(s) (collectively, the "Process"). While there are many budget friendly machines made overseas, DeEnterprises needed automation machine(s) as well as guidance on all aspects of this automation process including, but not limited to, someone who could act as its fiduciary to handle absolutely everything on its behalf from start to finish and beyond.  Accordingly, DeEnterprises reached out to Viking, which is located in Wisconsin, and due to their location and all their resources and representations online, appeared to be the experts in the type of sachet bags that DeEnterprises needed. Viking represented that they had substantial experience, qualifications and abilities to produce automation equipment including, specifically, sachet machines.

17.     On May 23, 2018, Viking's representatives met with DeEnterprises at their facility in West Chicago, IL. The goal of the meeting was to see if Viking could handle everything from start to finish and, if so, to get Viking the information and samples it would need to do everything

required as part of the Process for the job. During the meeting, DeEnterprises concerns were explicitly explained to Viking.

18.     The primary concern for DeEnterprises was whether the Viking machine would be able to successfully pump the sugar scrub product (*i.e.,* Pack 2). DeEnterprises has years of experience making and packaging sugar scrub into gallons and pails. The normal method of using a piston filler to pump liquids and pastes does not work well with sugar scrub. Due to the physical characteristics of the sugar scrub (including its thickness or viscosity), there are limitations on the height, speed and distance that the product can be moved. Piston fillers are one of the most common types of pumps used for filling liquids, pastes and gels. They use an electric or air-powered motor to cycle a plunger (piston) back and forth in a cylinder. When the piston is drawn back, it fills the cylinder with product from a source such as a hopper mounted above the intake or directly from a vessel (pail, drum or individual bulk container) through a hose. When the piston is pushed forward the product dispenses out. In order to fill the preformed pouches, DeEnterprises used small piston fillers to fill their sugar scrub sachets, but only with vertically mounted hoppers allowing for gravity and a short product-transfer distance.

19.     DeEnterprises' experience with these small piston fillers lead to their next concern with sugar scrub. Sugar granules are very strong and can cause premature wear on airtight mechanisms used in piston fillers. Many of the parts would wear out quickly requiring regular maintenance or part replacement. Parts on the small piston fillers were relatively inexpensive and required minimal downtime to replace. DeEnterprises was concerned that parts on a complex automated machine could become costly to replace and require significant downtime.

20.     The third concern was with automating sugar scrub specifically. During DeEnterprises' research into having their pedicure system contract packaged, some of the

companies DeEnterprises contacted were not interested in packaging the sugar scrub packets due to the same problems DeEnterprises had experienced themselves previously. The companies that were willing to quote the job often charged additional costs to handle the sugar scrub packets because of these difficulties. DeEnterprises knew that if contract packagers had concerns about running sugar scrub on their machines, then it was imperative that DeEnterprises make sure they select the right machine that could overcome these problems. All of this was explained to Viking during the meeting. Viking reassured DeEnterprises' owners that they had extensive experience pumping thick products with and without particulates. Viking specifically stated that they "have successfully pumped just about every product under the sun" and guaranteed that this would not be a problem. Viking also explained how they have a great relationship with their pump vendors and that they will—on behalf of DeEnterprises—do thorough testing up front to determine the right pump for the sugar scrub, design the machine, source equipment, and ensure that everything will operate correctly when assembled. As DeEnterprises' fiduciary, Viking represented that it could handle the entire Process from start to finish.

21. DeEnterprises made it clear that the goal was to automate packets that resembled their current packets as much as possible. In the cosmetic industry, looks and consistency are important in keeping customers coming back. DeEnterprises put a considerable amount of time and effort into designing their Pedicure Packet System. The size, design, and fill amounts were important to the products use and their customers' familiarity with the products they were using. The size was similar to the most popular brands already on the market.

22. Prior to this meeting, DeEnterprises were concerned they would need to buy multiple machines in order to automate all four packs. Obviously one machine is expensive, so needing to purchase multiple machines would add up quickly. Viking had a solution for this as

well. Viking said that it offered machines that use a rail system that would allow a single machine to utilize two different types of dispensing option pumps; hence, Viking represented and warranted that the machine that it designed, specified, sourced, and assembled would be able to pump all four of the DeEnterprises' products with a single machine and that Viking could handle the entire Process on behalf of DeEnterprises.

23.     Another concern was lead time and cost.  Although DeEnterprises was completely unfamiliar with automation and machines of this sort, they recognized that obtaining such a machine could have a long lead time. DeEnterprises represented that it needed to be up and running by the end of 2018.  Viking explained that the typical build time was 12 weeks for one of these machines due to the lead times on the pumps. Viking recommended DeEnterprises purchase one of their used frames to save time and money. Viking said that with a used frame they might be able to cut down the lead time to 8 weeks. They were not able to give a price for the machine without determining what pumps would be required but knew that DeEnterprises had set a budget of around $150,000 for a machine.

24.     During the meeting, Viking represented that that its sachet machines were extremely accurate and guaranteed that each packet would be consistently filled to within one or two grams of the intended fill volume. Viking also claimed that its machines were extremely well made and rarely went down, but if they did, Viking would be able to remotely access the machine over the Internet to diagnose problems. Moreover, Viking represented that its machines are designed to "run 24 hours a day for decades with only basic maintenance."  In addition, the difference between a single lane and multi-lane machine was discussed. The main difference being, quite literally, the number of sachets the machine can produce in one cycle. For example, a single

---

lane will produce one sachet with one cycle, while a 4-lane machine can produce four sachets with one cycle.

25.     In order to alleviate DeEnterprises' concerns about Viking being able to pump DeEnterprises' products and to provide a "proof of concept" video to prove that Viking could pump the products, Viking asked for product samples.  Viking forwarded the samples to its pump manufacturer (*i.e.,* "Hibar").  (*See* Ex. E, Email[1] from Viking, p. 1).  Viking represented that Hibar makes a great pump and that they are "extremely thorough with testing."  (*Id.*)

26.     Viking emailed a video on June 8, 2018 purporting to show pumping of DeEnterprises' sugar scrub product.  (*See* Ex. E, Email from Viking, p. 3).  Viking wrote that "I appreciate your patience, as these are not simple products to handle. <u>We want to be thorough in our testing to make sure what is promised is delivered.</u> The lead time from time of down-payment will be roughly two months for the auger and pump to be built. I'll be in touch shortly."  (*Id.*) (Emphasis added.) The email and video were some of the most important representations and warranties on which DeEnterprises relied in order to determine whether Viking was going to be able to handle the Process and provide the right solution for DeEnterprises' automated needs.

27.     On June 8, 2018, Viking emailed about its proposed sachet machine with a Hibar pump and represented that this single-lane machine would output about 35 sachets of DeEnterprises' products per minute (*i.e.,* 35 Bags per Minute "BPM").  (*See* Ex. E, Email from Viking, p. 4).

28.     On June 13, 2018, Viking emailed that product testing would be performed on June 13-14, 2018.  (*See* Ex. E, Email from Viking, p. 7).

---

[1] A chronological compilation of exemplary emails with annotations exchanged between Viking and DeEnterprises is attached hereto as Exhibit E and is referenced herein as "Email" for brevity.

29.     On June 29, 2018, Viking emailed that it was testing the product, and the final auger details for the machine would be finalized shortly.  (*See* Ex. E, Email from Viking, p. 8).

30.     On July 12, 2018, Viking emailed DeEnterprises a proposal and wrote that "[w]e are excited to begin this partnership. This SA300 [Viking's machine] will help you grow your business, streamline your packaging, and give you scalability to complete larger new orders. To get the process rolling, Viking requires a signed and initialed quote and P.O. Then our accounting team will send an invoice for the initial down-payment. Once we receive money, we will order the ancillary equipment ASAP and get to work on prepping the machine for you. Let me know if you have any out-standing questions or concerns with this system as laid out."  (*See* Ex. E, Email from Viking, p. 10).

31.     While considering the proposal's cost versus output, it became clear to DeEnterprises that a single-lane machine would not be able to output a high enough volume in bags per minute (BPM) should packet sales continue to grow at its current rate.  Thereafter, DeEnterprises called Viking and requested a quote for a 4-lane machine.

32.     On July 17, 2018, Viking sent over some preliminary numbers for a 4-lane machine. (*See* Ex. E, Email from Viking, p. 12).  Viking wrote that the "additional $140,000 [above the initial quote] is obviously a large step up in price" but represented that "[t]his would quadruple the output of the machine" and that "[a]t 30 cycles/minute, this machine can make and fill 7,200 sachets/hour. [i.e., 30BPM * 4 lanes * 60min/hour = 7,200 bags per hour, which is 120BPM]." (*Id*.) (Emphasis added). To bolster its credentials and induce DeEnterprises to rely on Viking's representations and warranties, Viking provided a "case study" from one of its other customers who made a "$200,000+ investment [which] was an enormous risk for them" and stated that "our [Viking] machine completely transformed their packaging process."  (*Id.*). The Viking

representative further stated that "I hope it [the case study] gives you an additional level of comfort as you consider investing in Viking as a partner in automation." (*Id.*). DeEnterprises specifically relied on these representations and those on the Viking web site to conclude that Viking would be able to deliver what it promised and warranted.

33. On July 17, 2018, Viking emailed over two different return on investment ("ROI") calculators to help DeEnterprises assess the potential investment. (*See* Ex. E, Email from Viking, p. 14).

34. On July 24, 2018, Viking emailed its proposal for the 4-lane sachet machine. (*See* Ex. E, Email from Viking, p. 17).

35. Based on Viking's representations and warranties (including those on its web site), and further in view of the information and "proof of concept" video that was provided, DeEnterprises accepted Viking's proposal and executed this first contract (*i.e.,* the "Original Contract") on August 9, 2018. (Ex. A, Original Contract). And, Viking acknowledged receipt of the signed proposal on August 10, 2018. (*See* Ex. E, Email from Viking, p. 19).

36. On August 20, 2018, Viking reached out to DeEnterprises to initiate the project. (*See* Ex. E, Email from Viking, p. 20). Viking included a list of items that would require DeEnterprises' input as well as a preliminary project plan. (*Id.*). The project plan showed an expected date of December 17, 2018 to ship the completed machine to DeEnterprises. (*See* Ex. E, Email from Viking, p. 22).

37. At this time, DeEnterprises stressed to Viking the importance of a December 2018 delivery, because second quarter of the year is a popular time for pedicure customers to stock up for the upcoming pedicure season. With long lead times on film as well as time to produce an

inventory of enough packets, DeEnterprises would need as much time as it could to be ready. Hence, time was of the essence on the project.

38.     On September 4, 2018, Viking requested 2 pounds of DeEnterprises' salt foot soak [granular product] product for "initial testing" because "[i]t is important to test [the foot soak] with very small augers and the concern is the size of the granular that must fit inside the bag, through the augers." (*See* Ex. E, Email from Viking, p. 24).  DeEnterprises was shocked by this since—prior to DeEnterprises entering into the Original Contract—Viking had previously represented that "thorough testing" had already been conducted. DeEnterprises shipped 2 gallons of 5 different products including (2 foot soak gallons, 2 sugar scrub gallons, 2 mask gallons, 2 body butter gallons and 2 callus remover gallons) to Viking that were delivered September 9, 2018.

39.     On September 7, 2018, Viking emailed that "[e]qually importantly to the project timeline, can you provide the granular product so we can test with the augers? This is critical to sizing the total sachet."  (*See* Ex. E, Email from Viking, p. 25). DeEnterprises promptly informed Viking 2 gallons (10 lbs) of the product was included in the boxes they received the previous day. (*See* Ex. E, Email from Viking, p. 27).

40.     On September 21, 2018, Viking reached out to confirm what the fourth product DeEnterprises had intended to run. This was in error as four products were contracted to be ran and a fifth product was intended to be tested for compatibility only. Viking's project manager was not familiar with what products that were this project were intended to automate. (*See* Ex. E, Email from Viking, p. 28-31).

41.     On September 21, 2018, Viking emailed that, despite its prior testing and representations, there was a problem with the sugar scrub product.  Viking observed that it is "very thick and includes grit so it requires a lance diameter larger than allowable [under the Original

Contract] for the sachet size." (*See* Ex. E, Email from Viking, p. 32). This admission that Viking was not able to pump the sugar scrub as previously represented was a devastating revelation to DeEnterprises.

42.     On September 24, 2018, DeEnterprises learned that Viking was not able to pump the sugar scrub as previously represented and then immediately wrote Viking that "[t]his machine has ZERO value to my company without being able to do the sugar scrub.  We put exceptional stress on this point during our initial meetings.  We were sent videos of the sugar scrub being pumped.  Telling me you cannot do this product AFTER my 160K check is in the bank is disappointing to say the least." (*See* Ex. E, Email from DeEnterprises, p. 33) (emphasis added).

43.     On September 25, 2018, Viking acknowledged the misrepresentation and said that "we [Viking] certainly appreciate the frustration when additional product testing happens after the sale. I'm working with Hibar to understand the differences from original testing (green) [video of June 8, 2018] and their testing last week (pink). We understand the urgency and will continue to press them for information."  (*See* Ex. E, Email from Viking, p. 35).

44.     On September 28, 2018, DeEnterprises emailed Viking that:

| |
|---|
| **Peter DeSantis** <pdesantis@deenterprises.com>  Fri, Sep 28, 2018 at 10:21 AM<br>To: Benjamin Wynveen <Ben.Wynveen@vikingmasek.com><br>Cc: Frankie DeSantis <frankie@deenterprises.com>, Andrew Bayliss <andrew.bayliss@vikingmasek.com><br><br>Bemjamin and Andrew,<br><br>Our owners all just had a meeting about this and we are losing faith in Viking. We need answers by Tuesday or we want our money back. It's costing us too much to wait around and the December delivery deadline is looking unrealistic. |

45.     At this point, time estimations were even more critical to DeEnterprises due to its current packet inventory. Its inventory was running low and if DeEnterprises ran out, it would lose sales and whole customer accounts.  Consequently, it was vital Viking needed to provide their best possible time estimates.

46.     On October 2, 2018, Viking admitted that the machine would <u>not</u> be able to run the four products as required by the Original Contract and that the video for the sugar scrub product did not accurately show pumping the sugar scrub through a 9mm lance as had been represented and required, but instead was pumping through a larger 5/8" lance.  (*See* Ex. E, Email from Viking, p. 36).  This was a critical misrepresentation by Viking to DeEnterprises.  Viking blamed this on a "miscommunication" that it allegedly had with its pump supplier, Hibar.  (*Id*.)  Viking admitted that it "did <u>not</u> communicate the exact size of the lance to them [Hibar] early enough, so that piece falls on us [Viking]" and characterized this misrepresentation as allegedly "simply bad luck."  (*Id*.) (Emphasis added).

47.     Viking also falsely represented that "[t]o be frank, if we cannot make and fill your pouches with your current sizes, no other manufacturer will be able to either. There are simply physical limitations to the size of the tube the sugar scrub can be pumped through." (*Id*.)  However, on information and belief, Viking's claim was clearly false because the top two selling pedicure packet systems on the market (DeEnterprises' competitors) use sachets of about the same size produced with an automated machine—which can be confirmed based on a visual inspection of the seal and appearance of their sachets—for their virtually identical sugar scrubs with similar dimensions, products and fill volumes.

48.     Since Viking could not make a 4-lane machine work, Viking recommended that it "widen the pouches to 90mm" and warranted that "[a]t this width, we [Viking] could do a 3-lane sachet" and the machine would have an "<u>output of 90ppm</u>" (*i.e.,* 3 lanes * 30BPM/lane = total output of 90BPM).  (*Id*.) (Emphasis added).

49.     Viking concluded its email stating that "[k]nowing that this project has not gotten off on the right foot, Viking would work with you on a discount in order to regain your trust, keep

this project moving in the right direction, and take the sting out of additional interest payments. We all wish this had gone smoother from the beginning, but <u>we can salvage this and give you the best solution possible.  Automation is the next step for you, and we do have the right solution</u>." (*See* Ex. E, Email from Viking, pp. 36-37).   (Emphasis added).

50.     In view of (a) Viking's misrepresentations and inability to provide a 4-lane machine that would work, (b) the substantial loan DeEnterprises took out to fund the purchase and the interest on the loan continuing to accrue, (c) the fact that DeEnterprises' inventory was running out and the next pedicure season was rapidly approaching, DeEnterprises attempted to cancel the contract. However, Viking refused to cancel the Original Contract despite its inability to perform in accordance with the terms.

51.     At this time, DeEnterprises reached out to most of their packet customers and explained the situation. DeEnterprises hoped that they had not missed the opportunity to scale with the growth of the individual pedicure packet trend. There were many new brands launching in the industry, but as long as DeEnterprises was shipping product by spring of 2019, DeEnterprises hoped to be able to minimize the damage caused by Viking.

52.     With respect to Viking's proposed 3-lane machine, Viking wrote that it was going "to confirm exact tube diameters <u>in order to be 100% confident in running all products</u> (final confirmation likely tomorrow."  (*See* Ex. E, Email from Viking, p. 38) (emphasis added).

53.     On October 3, 2018, Viking sent example pictures of different types of seals made by Viking's sachet machines. (*See* Ex. E, Email from Viking, p. 40).  Of the three sample photos sent DeEnterprises selected one as their favorite saying "We are hoping for the seals resembling the Blue Apron sachets. We'd be disappointed with the Fisher nuts sachet." (*See* Ex. E, Email from

Viking, p. 42).  To which Viking falsely mislead DeEnterprises about what seals their contracted

machine would have:

| Andrew Bayliss <andrew.bayliss@vikingmasek.com> | Wed, Oct 3, 2018 at 3:38 PM |
|---|---|

Frankie,

Yes, those would definitely be the seals we have planned for you. The Fisher Nuts sachet not only has different seal style, but is also very cheap film. Your film is much nicer, and will produce sachets similar in quality and appearance to the Blue Apron samples.

(*See* Ex. E, Email from Viking, p. 46).

54.     On October 5, 2018, Viking provided this confirmation and wrote that:

| Andrew Bayliss <andrew.bayliss@vikingmasek.com> | Fri, Oct 5, 2018 at 3:11 PM |
|---|---|
| To: Peter DeSantis <pdesantis@deenterprises.com>, Frank DeSantis <frankie@deenterprises.com> | |

Peter & Frankie,

I wanted to pass on this information so we can keep moving on getting this solution finalized:

- First, we recommend a 100mm x 90mm sachet. This will allow us to get an 18mm lance down the forming tube, which can run all products including the pink sugar scrub.
- Second, using an 18mm lance means we expect right around 30 cycles per minute, or 90 pouches per minute of production
- Third, we will push to get this in your door by year end. A December ship date is possible, but we cannot guarantee it due Hibar's lead time and our build time. Thus, this is what we will propose via change order on Monday:

(*See* Ex. E, Email from Viking, p. 51) (emphasis added).

55.     On October 15, 2018, Viking provided its proposed change order (*i.e.*, First Change

Order).  (*See* Ex. E, Email from Viking, p. 56).  This is the second contract between DeEnterprises

and Viking.  The executed First Change Order is attached hereto as Exhibit B.

56.     Based on Viking's representations and express warranties, Viking induced

DeEnterprises to enter into the First Change Order (new contract) and agree to the 3-lane sachet

machine that Viking represented and warranted would produce 90BPM of DeEnterprises'

products.  (Ex. B, First Change Order; Ex. E, Email from Viking, p. 54).  The First Change Order

specified the $300,000 price for the machine and the only terms for the contract were 100% payment prior to shipment. (*Id*.) (Emphasis added below).



57.     On October 26, 2018, DeEnterprises entered into a third contract (*i.e.,* Second Change Order) to address Viking's recommendations for additional machine changes. (Ex. C, Second Change Order).  The only terms for this contract was a generic payment representation of "50/50." (*Id.*) (Emphasis added below).

---



58.     By December 2018, DeEnterprises' packets sales had dwindled to a fraction of what it had been. New pedicure packet competition was growing by the week and DeEnterprises' ability to ship pedicure packets for the new pedicure season was no longer achievable. DeEnterprises was desperate to salvage its project that it had worked tirelessly to build for the prior two years. Viking's constant and repeated promises that the machine would be ready shortly had left DeEnterprises completely out of packets with none on order.

59.     By April 2019, DeEnterprises had lost most of its customers and still did not have a sachet machine or any idea if, or when, Viking would provide one that worked.  Finally, on April 9, 2019, DeEnterprises emailed Viking and demanded that Viking either work out the bugs and provide a "machine [that] works as originally promised including proper packet size and speed across all 4 products" or DeEnterprises wanted its money refunded in full with the thousands of dollars in interest that it had paid plus compensation for their lost profits for having to miss out on the entire pedicure season. (*See* Ex. E, Email from DeEnterprises, p. 58).  And, DeEnterprises threatened that it would file suit if necessary.

---

60.     On April 16, 2019, Viking sent another video to DeEnterprises purporting to show the machine running and sugar scrub being pumped. (*See* Ex. E, Email from Viking, pp. 59-60). The video did not show any detail, and the required size and fill weights were not shown.

61.     On April 18, 2019, Viking emailed that the video it provided showed "success" and asked "[w]ould you agree the progress made shows our ability to adapt based on product testing and commitment to provide the best possible solution we are able? If so, are you retracting the requests made below? If not, what more are you seeking so we can open dialogue?" (*See* Ex. E, Email from Viking, p. 60).

62.     Based on Viking's purported success and alleged video proof, DeEnterprises relented and hoped that Viking would be able to deliver what it had promised. (*See* Ex. E, Email from DeEnterprises, p. 60).

63.     On May 8, 2019, Viking sent another video purporting to show the machine working (*See* Ex. E, Email from Viking, pp. 64-66). Viking then asked for DeEnterprises to "sign the attached shipping document and once received, [so] we [Viking] can send the final invoice to prep the machine for shipment." (*See* Ex. E, Email from Viking, p. 66).

64.     Since Viking previously had taken the position that the machine was going to be sold "as is" (*see* Ex. A, Original Contract, p. 10, para. 5), DeEnterprises did not want to take any changes and it was imperative to verify that the machine performed in accordance with the contracted specifications prior to accepting it and allowing Viking to ship it to DeEnterprises. Accordingly, on May 8, 2019, DeEnterprises emailed questions and concerns it had before signing off on the machine and specifically asked "[w]hat were the sizes, fill weights and BPM of the units filled in your facility for each of the 4 products?" (*See* Ex. E, Email from DeEnterprises, p. 67).

DeEnterprises further requested confirmation of Viking's ability to pump the DeEnterprises' products. (*Id.*)

65. On May 8, 2018, Viking falsely represented that the products ran "without issue." (*See* Ex. E, Email from Viking, p. 68).

66. On May 13, 2019, DeEnterprises called Viking and requested an in-person meeting to validate whether the machine worked and was ready to be shipped.

67. On May 15, 2019, Viking emailed DeEnterprises and falsely represented that "[w]e've demonstrated, through the samples and multiple videos you received, that we have completed the contract [quote 04418 Rev 4, signed 08/09/18] along with associated change orders [41970-CO-001 on 10/17/18 and 41970-CO-002 on 10/26/18]. We will be sending the final invoice per the terms of the contract and are prepared to ship the equipment upon receipt of final payment. With all due respect, this is an extremely custom piece of equipment with application specific parts and as such, we are not able to provide a refund, either in part or whole." (*See* Ex. E, Email from Viking, p. 69).

68. On May 15, 2019, DeEnterprises emailed back that:

Frank DeSantis <frankie@deenterprises.com>                          Wed, May 15, 2019 at 1:20 PM
To: Benjamin Wynveen <Ben.Wynveen@vikingmasek.com>
Cc: "Peter DeSantis (pdesantis@deenterprises.com)" <pdesantis@deenterprises.com>, Andrew Bayliss
<andrew.bayliss@vikingmasek.com>, Ty Weinhold <ty.weinhold@vikingmasek.com>

We need to see proof that this machine does what we contracted it for. Thoses sample you sent me are not good
enough. It proves you can sachet the product, but not at the proper volume, speed or film length contracted for. I need to
see completed sachets of the 4 products, in the proper fill sizes requested in 100x100mm film per your signed revision
change order 41970-C0-001 (attached). I need to see the finished products to determine that you did fulfill your end of
the contract. I was provided samples of film thats too long, filled too volumes too large to sell, with video at a rate of a
2/3 of the speed your contract states.

If you need another roll of sample film to complete this, I'll order it today. Below is the fill volumes we contracted you to do
and 100mmx100mm film is the max what we signed off for. Its not unreasonable to verify that Viking has truly fulfilled its
contract before paying in full. Prove to me that you fulfilled your end of the contract in full, and I'll happily send the
check.

This is what we are contracted for.

Proper Fill Sizes
Step 1 - Foot Soak 32gm
Step 2 - Sugar Scrub 25gm
Step 3 - Mask 28 gm
Step 4 - Massage Butter 18gm

Proper Film Size:
100mm x 100mm

Proper Fill Speed:
30 bags per minute per lane.

Thank you,
Frankie

(*See* Ex. E, Email from Viking, p. 70).

69.     On May 28, 2019, DeEnterprises inspected the machine at Viking's facility. For

the test, the machine was running water, and not any of DeEnterprises' products. Viking's

technician running the test admitted that the machine was not able to pump the sugar scrub using

the liquid filler and that the sugar scrub was getting clumped up in the lances of the machine.

DeEnterprises then discovered the foot soak could not reach the intended fill volume. The

technician was testing different methods to achieve the correct fill volume. DeEnterprises asked

the technician whether the machine would ever be able to perform in accordance with the contract

specifications, and the technician stated, "I don't think so." Clearly, despite Viking's emails in

May 2018, the machine did not work and was not ready for shipment, and Viking's representations

were patently false. When asked about the body butter and mask products, the technician admitted that neither one had even been tested on the specified sachet size.

70. On May 28, 2019, DeEnterprises emailed Viking and confirmed that the machine did not work and was not ready to be shipped. (*See* Ex. E, Email from DeEnterprises, pp. 75-76).

71. On May 29, 2019, DeEnterprises emailed again stating that "the machine isn't ready" and that the Viking technician had admitted to all of the issues with the machine. DeEnterprises stated that Viking's representation that the machine was complete "was a flat out lie" and expressed shock that Viking had tried to defraud DeEnterprises by attempting "to ship the machine in its current state." (*See* Ex. E, Email from DeEnterprises, p. 81) (emphasis added).

72. On May 31, 2019, Viking emailed back stating that "[a]s mentioned during our meeting, we are committed to getting you a machine meeting your expectations." (*See* Ex. E, Email from Viking, p. 83).

73. On August 20, 2019, Viking provided additional videos purporting to show the machine working. (*See* Ex. E, Email from Viking, p. 84).

74. On August 21, 2019, DeEnterprises again visited the Viking facility to verify Viking's representation that the machine was finished and ready for shipment. The tests were a complete failure and were detailed in a summary provided by DeEnterprises. (*See* Ex. E, Email from DeEnterprises, pp. 85-86).

75. On September 19, 2019, DeEnterprises and Viking had a telephone conference, which was recorded with the consent of both parties. Afterwards, DeEnterprises emailed a summary confirmation of the call in which it stated that in pertinent part that:

From our perspective, the machine does not work, and Viking cannot get it to work. But I generally directed you to what I wrote in my August 21, 2019 email for some sample guidance as to what we want to see. You can still refer to that but let me be even more clear.

If you believe that you have a fully functional finished machine that works completely, correctly, and reliably in accordance with all of the contracted specifications, we want to see a separate video for each product being run on the machine continuously for at least two hours each. We want to see all aspects of the machine in the video. The video needs to prove, for each product, that it can handle our creams, gels, and granular powder at the contracted weight/volume, filler type, film, bag size, and bag type, and that the machine can run reliably and continuously.

If you can provide videos showing that the machine will do everything required under the contract and do so reliably and continuously, then we will want to come up to inspect the machine ourselves. You indicated that you were available for an in-person inspection Monday through Thursday of next week. If you can provide the videos and speed matrix tomorrow, then we would like to come up on September 24, 2019 to see the machine operate. We do not want to come up yet again and see a machine that does not work.

If you cannot provide these materials, then, per your own statement, the "time has run out" and we need to end this. We are out of time and options, and cannot afford to withstand any further damage to our business. We need the machine or a refund, now.

Per my prior email, please immediately confirm that Viking will be providing a prompt refund if it cannot tender a fully functional working machine. I asked you to confirm this in my prior email. You ignored my request. I am asking again. Honestly, this should not be controversial and should be easy enough to confirm. We would appreciate a direct answer.

(*See* Ex. E, Email from DeEnterprises, pp. 95-96) (emphasis added).

76.     On September 20, 2019, Viking responded and alleged that it "has performed" in accordance with the contract and that it "is ready to ship the Equipment [machine]." (*See* Ex. E, Email from Viking, pp. 93-94). And, that the machine satisfies the "project specifications" in the contract, which it reproduced in its email as:

Quote #04418 Rev 4 / Preowned SA300 / 2018 – DeEnterprises Inc., USA

### Article I.    Project Specifications

| Product: | Creams & Gels | Granular Powder |
|---|---|---|
| Weight/Volume: | 17-30ml | 32 grams |
| Bulk density: | Undetermined | |
| Requested speed:* | 30BPM | 30BPM |
| Filler type: | Liquid Filler | Auger Filler |
| Film: | Laminate barrier film | Laminate |
| Bag sizes: | 63mm x 140mm | 63mm x 140mm |
| Bag styles: | Sachet | Sachet |

Terms of delivery:    FCA from original manufacturer unless otherwise noted
Requested delivery date:
Critical project notes:

*Note: Actual speed is dependent on the product characteristics/quality, filling weight/volume, film quality, operator, product infeed and ambient conditions. Speeds will be confirmed upon trials with original film and product.

(*See* Ex. E, Email from Viking, p. 95; Ex. A, p. 2).
.

77.    In its September 20, 2019 email, Viking misrepresented that "[t]he Quote [from the Original Contract] integrates the Terms and Conditions of sale, acceptance, delivery and the warranty provided thereafter. It has not been amended, altered, addended or rescinded, but remains in force as-is. No prior discussions that were not written into the Quote, and no amount of amount of back-and-forth since, including recorded phone conversations, have changed the terms of the Quote." (*See* Ex. E, Email from Viking, pp. 93-94).

78.    Viking's September 20, 2019 email patently misrepresented the parties' agreement and completely ignored the contract embodied in the First Change Order of October 15, 2018 that

---

changed the terms of the agreement as well as provided Viking's express warranty of October 5, 2018, which formed the basis for that contract.

79. DeEnterprises responded on September 20, 2019 with an email stating that:

Ty,

DeEnterprises has never lost sight of its expectations or obligations. We agreed to purchase a machine that would perform in accordance with certain specifications. (Obviously, you are aware of the specifications because you quoted them in your email.) Viking has thus far failed to provide such a machine and we do not believe that you will be able to provide one.

In paragraph 5 of the terms and conditions of the quote, Viking expressly "recommends that buyer [DeEnterprises] inspect the equipment sold hereunder" and that Viking "shall not be responsible for

5

the consequences of buyer's failure to inspect the equipment for any inaccuracies, insufficiencies, or omissions in any descriptions specifications of it." That is what we have been trying to do and requesting. We do not think that the machine works and is ready to ship. All we have requested was proof. Please provide the requested videos showing that it runs continuously in accordance with the project specifications to prove that it actually works.

We asked for this proof prior to coming up to inspect the machine yet again, because Viking has wasted our time twice before. In particular, Viking told us in May 2019 that the machine was complete, operational, and ready for delivery. We then traveled to Wisconsin to inspect the machine. Upon inspection, we learned that the machine had not successfully run any of the 4 products at the contracted packet sizes or fill volumes. Hence, the machine did not even remotely satisfy the contracted specifications. Consequently, Viking's representation in May 2019 was false. Then, in August 2019, Viking again told us that the machine was complete, operational, and ready for delivery. We again traveled to Wisconsin to inspect the machine. The first product that Viking was going try to demonstrate was the sugar scrub. The machine operated for approximately 30 seconds before failing. The mechanical failures included hoses failing and blowing off the machine, trim malfunctions, and seal failures. Further, the pump cart was inexplicably missing the transfer pump. And, for the packets produced in the 30 seconds that the machine ran before catastrophic failure, the produced product did not meet the contracted specifications. And, Viking could not run any of the other 3 products. Thus, yet again, Viking's August 2019 representation was false.

Regarding the contracted speed, Viking was the party who came up with the speed. Based on Viking's representation regarding speed, DeEnterprises selected the number of lanes that would be required to satisfy product demand. The representation regarding 30 bpm was the number advertised by Viking.

If you believe that you have made a machine that satisfies the project specifications, please prove it to us. That is all that we have asked and are asking. Either the machine works or it does not. If it does not work, we obviously are not going to allow you to ship it to us. If you cannot make a machine that runs all 4 products and satisfies the product specifications, then Viking is in breach of contract and needs to return our money. It is not a matter of us no longer wanting a machine, but Viking's inability to provide it. Viking said that this project would take 8-12 weeks. It has now been over 58 weeks. Again, to quote you, "time has run out on this project." If you have a machine that works, please prove it. If not, please confirm that you will refund our money.

(*See* Ex. E, Email from DeEnterprises, pp. 91-92) (emphasis added).

80.     On September 25, 2019, Viking emailed that it was "concerned about the problems that have arisen regarding this project, we [Viking] apologize that you have made trips to our facility that did not go as planned, and we remain committed to delivering the Equipment as agreed." (*See* Ex. E, Email from Viking, p. 90). Viking again falsely represented that "the Equipment meets the agreed-upon written specifications," "this is proven," and "we can deliver at any time." (*Id.*) (Emphasis added).

81.     On September 25, 2019, DeEnterprises provided its final comprehensive email summary and requested clarification of Viking's position:

Ty,

Thank you for your email.  I'd like to clarify some information to see whether Viking has produced a machine that works as specified and promised.  If you are representing that Viking has produced a machine that works as noted below, we will come up to inspect the machine ourselves so we can verify that it works and move forward.  (For your reference, attached is a bookmarked pdf of the contract documents and correspondence with the applicable portions highlighted in order to facilitate the following discussion).

By way of background, as Viking knew and knows, we neither had nor have any automation experience.  As we told Viking, we simply wanted to automate making sachets with our products.  Viking represented that it had the necessary experience, qualifications and abilities to source necessary materials and equipment in order to assemble a sachet packaging machine that would work with our products.  We understood that Viking was in essence going to be our manager as it would get everything that was needed, assemble it, make sure that it worked, and protect our project from financial overruns.  Viking assured us that it could and would make this proposed automation work and do so in a timely manner.

Based on our familiarity with our products, we expressed a concern from the very beginning about Viking being able to provide an automation system that could pump our sugar scrub product (i.e., a gel) into 63mm x 140mm sachet bags.  In this regard, we provided Viking with samples of our sugar scrub product so Viking could prove that it could pump the sugar scrub.  In response, on June 8, 2018, Mr. Bayliss sent us a "proof of concept" video purporting to show our sugar scrub product being pumped and assured us that Viking was "thorough" in its "testing to make sure that what is promised is delivered." (See PDF, p. 1).  Mr. Bayliss said that it would be roughly two months for a system to be built for us.  Based on the "proof of concept" video and Viking's representations, we indicated that we wanted to proceed with the project.

Accordingly, on July 12, 2018, Viking provided Quote #04418 Rev 2 for a single lane machine that would make sachet bags at a speed of 30BPM at respective weights/volumes for creams & gels at 17-30ml per bag and for granular powder at 32 grams per bag. (See PDF, p. 3, Article I "Specifications;" PDF, p. 4, Article III "Price" for "Viking Single Lane SA300 Sachet Machine and Application Parts").  The "total system price" for the single lane machine was $146,450.  (See PDF, p. 6).  Based on the information Viking provided, this was not acceptable because it would not output a sufficient quantity of bags per minute.

In response, Mr. Bayliss sent me an email on July 17, 2018 with "budgetary numbers for a 4-lane machine." (See PDF, p. 13). He represented that the 4-lane system "would quadruple the output of the machine for less than double the investment." (See PDF p. 13). In other words, a single lane machine per the original quote would output 30BPM and a 4-lane machine would produce 30BPM per lane for a total of 120BPM (i.e., 4 lanes * 30BPM = 120BPM). He also provided ROI calculators to enable us to evaluate the cost versus the output. (See PDF, p. 15).

Based on Viking's representations, we told Mr. Bayliss that we would like to proceed with the 4-lane system. On July 24, 2018, Viking then provided Quote #04418 Rev. 4 for the 4-lane machine in which each lane would produce bags at a speed of 30BPM at respective weight/volume for creams & gels at 17-30ml per bag and for granular powder at 32 grams per bag. (See PDF, p. 17, Article I "Specifications;" PDF, p. 19, Article III "Price" for Viking "4-Lane SA300 Change-Over Kit" to convert the machine to a 4-lane system). The "total system price" for the 4-lane machine was $332,743. (See PDF, p. 20).

Based on Mr. Bayliss' representation that the 4-lane machine would quadruple the output, we agreed to pay an extra $186,293 (i.e., the difference between the initial quote of $146,450 and the new quote of $332,743) to get a 4-lane machine that would produce 120BPM (i.e., 30BPM per lane) and signed the revised quote on August 9, 2018. (See PDF, p. 34).

On October 2, 2018, Mr. Bayliss emailed us that Viking had made a mistake and that it was not able to pump the sugar scrub. (See PDF, p. 38). And, Mr. Bayliss admitted that the "proof of concept" video was false since it was using a 5/8" lance as opposed to what had been misrepresented to us in the video as a 9mm lance. (See PDF, p. 38). Mr. Bayliss explained that the false video was based on a miscommunication between Viking and Hibar (the pump manufacturer) and that Viking "did not communicate [to Hibar] the exact size of the lance to them early enough, so that piece [error] falls on us [Viking]." (See PDF, p. 38).

Mr. Bayliss further stated that "[k]nowing that this project has not gotten off on the right foot, Viking would work with you on a discount in order to regain your trust, keep this project moving in the right direction, and take the sting out of additional interest payments. We all wish this had gone smoother from the beginning, but we can salvage this and give you the best solution possible. Automation is the next step for you, and we do have the right solution." (See PDF, pp. 38-39).

In order to overcome Viking's inability to pump the sugar scrub as previously promised, Viking recommended decreasing the number of lanes from 3 to 4, and switching to a "100mm x 90mm sachet" that "would allow [Viking] to get an 18mm lance down the form forming tube, which can run all products including the pink sugar scrub." (See PDF, p. 40). Mr. Baylis stated that "using an 18mm lance means we [Viking] expect right around 30 cycles per minute, or 90 pouches per minute of production." (See PDF, p. 40). Viking then quoted a revised "Total Price for 3 lane SA300 System" of $300,000. (See PDF, p. 40). Again, based on Viking's represented experience, qualifications and abilities, and that Viking "did have the right solution" for us (See PDF, p. 39), we agreed to Viking's proposal.

2

As referenced in my prior email, after a great deal of time that resulted in us losing every single one of customers, Viking told us in May 2019 that the machine was complete, operational, and ready for delivery. We then traveled to Wisconsin to inspect the machine. Upon inspection, we learned that the machine had not successfully run any of the 4 products at the contracted packet sizes or fill volumes. Hence, the machine did not even remotely satisfy the contracted specifications. Then, in August 2019, Viking again told us that the machine was complete, operational, and ready for delivery. We again traveled to Wisconsin to inspect the machine. The first product that Viking was going try to demonstrate was the sugar scrub. The machine operated for approximately 30 seconds before failing. The mechanical failures included hoses failing and blowing off the machine, trim malfunctions, and seal failures. Further, the pump cart was inexplicably missing the transfer pump. And, for the packets produced in the 30 seconds that the machine ran before catastrophic failure, the produced product did not meet the contracted specifications. And, Viking could not run any of the other 3 products. Thus, as of August 2019, the machine still did not work.

In your email from earlier today, you represent that the machine "meets the agreed-upon written specifications (30bpm = 10cpm). This is proven, and we can deliver at any time the Equipment that runs per the specs." To make sure that we are all on the same page, are you representing that each lane of the machine produces sachets at 30BPM, as required by the contract? In other words, does the machine have total output of 90BPM (i.e., 3 lanes * 30BPM)? Or, can the machine only output a total of 30BPM even though it has 3 lanes)?

Obviously, we only agreed to pay double the cost of the single lane machine (i.e., a total of $300,000 for the 3-lane machine as opposed to the initial quote of $146,450 for the single lane machine) in order to have an automated 3-lane system that would produce a total output of 90BPM as contracted and promised.  Hence, before we come up a final time to inspect the machine, we just want to make sure that it will do what we were promised and what the contract requires.

Please confirm that the machine will produce a total output of 90BPM and we will come up for the final inspection.  Alternatively, if you are stating that, after over 58 weeks on this project, the machine can only produce 30BPM and that this is the best that Viking can do, please let us know if Viking is willing to refund the 90% of the purchase price that we already paid.  (We hope that Viking is not trying to take the position that (a) the extra $153,550 paid was for nothing and that the machine can only produce 30BPM, which the single lane would produce, and (b) that the contract only required Viking to produce a 3-lane machine that could only output a total of 30BPM across all lanes.)

Again, to quote you, "time has run out on this project."  Accordingly, it is time to wrap this up one way or another.  If you could get back to us as soon as possible, we would appreciate it.

(*See* Ex. E, Email from DeEnterprises, pp. 87-89) (emphasis added).

82.     Viking never responded to the September 25, 2019 email or to DeEnterprises' follow up email of September 30, 2019.

83.     DeEnterprises has lost every single sachet customer that it had based on Viking's failure to provide the machine per the parties' agreement.

84.     Viking's representations and warranties to DeEnterprises are consistent with the representations Viking makes on its web site.

85.     In particular, on its "First Time Buyer" page, Viking represents that "[o]ur first-time buyer's resources will help you understand the different types of packaging machines, answer the most common packaging machinery questions, and provide tips on how to make the best packaging automation decision for your business." (*See* Ex. F, p. 2, https://vikingmasek.com/packaging-machines/first-time-buyers.)

86.     Regarding the speed (*i.e.,* output in BPM) for its sachet machines, Viking represents that "[p]ackaging equipment speeds are usually represented by bags per minute (BPM), which is

how many finished bags can be completed per minute. Machines will usually be rated for a maximum number of bags per minute. Generally, automated flexible packaging machines can be rated for anywhere from <u>30 - 300 bags per minute</u>." (*See* Ex. F, p. 2, https://vikingmasek.com/packaging-machines/first-time-buyers) (emphasis added).

87.     On its web site, Viking specifically provides a chart showing the multilane sachet throughput for its machines, which is consistent with what Viking represented and warranted to DeEnterprises throughout the Process including, but not limited to, the time period prior to and after execution of the First Change Order.



▼ **How do I know if my production needs are high enough to make packaging automation worth it?**

Below certain production levels it just doesn't make sense to automate your packaging. Likewise, if your production levels are quite high you may have to prepare to invest in multiple systems or multilane packaging equipment.

To help you see where your production levels fall, below are two tables that give you estimated number of bags a packaging machine can produce in certain time periods.

Assumptions: 8 hour shifts, one shift per day, 21 working days per month, 251 working days per year.

**VFFS machine throughput**

| Bags per minute (BPM) | Bags per hour | Bags per shift | Bags per month | Bags per year |
|---|---|---|---|---|
| 60 | 3,600 | 28,800 | 604,800 | 7,228,800 |
| 120 | 7,200 | 57,600 | 1,209,600 | 14,457,600 |
| 180 | 10,800 | 86,400 | 1,814,400 | 21,686,400 |

**Multilane stick or sachet machine throughput**

| Number of lanes | Bags per minute (BPM) | Bags per hour | Bags per shift | Bags per month | Bags per year |
|---|---|---|---|---|---|
| 2 | 80 | 4,800 | 38,400 | 806,400 | 9,638,400 |
| 4 | 160 | 9,600 | 76,800 | 1,612,800 | 19,276,800 |
| 6 | 240 | 14,400 | 115,200 | 2,419,200 | 28,915,200 |
| 8 | 320 | 19,200 | 153,600 | 3,225,600 | 38,553,600 |
| 10 | 400 | 24,000 | 192,000 | 4,032,000 | 48,192,000 |

(*Compare, e.g.,* Ex. F, p. 5, https://vikingmasek.com/packaging-machines/first-time-buyers; Ex. E, Email from Viking, pp. 12, 36, 51) (emphasis added)..

88.     On Viking's Innovative Machinery web page, Viking represents that its "Engineers are second-to-none." (*See* Ex. G, p. 2, https://vikingmasek.com/about-us/innovative-packaging-machinery-and-technology). On information and belief, Viking does not employ any degreed

engineers, and no person at Viking—who worked on the DeEnterprises' project or was involved in the Process at Viking—had a degree in engineering.

89.     Accordingly, reliance by DeEnterprises on the repeated private and public representations and warranties from Viking, and Viking representations and warranties that it could handle the entire Process on behalf of DeEnterprises, was commercially reasonable and specifically intended by Viking to induce DeEnterprises to enter into the Original Contract, First Change Order, and Second Change Order, as well as to induce the public into entering into contracts to purchase sachet machines from Viking.

## COUNT I
### (Illinois Consumer Fraud and Deceptive Business Practices Act – 815 ILCS 505)

90.     DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 88 of this Complaint as set forth fully herein.

91.     On information and belief, Viking engaged in numerous deceptive acts and deceptive trade practices, made misrepresentations and false statements of material fact, and provided false videos, as detailed in the foregoing paragraphs (collectively, Viking's "Conduct").

92.     Viking engaged in its Conduct with the intent that DeEnterprises would rely on it, and thus would induce DeEnterprises to enter into the Original Contract to purchase a sachet machine and the subsequent First Change order and Second Change Order for the machine.

93.     DeEnterprises did, in fact, rely to its detriment on Viking's Conduct, and thus entered into the Original Contract to purchase a sachet machine, and the subsequent First Change Order and Second Change Order for the machine.

94.     Viking's Conduct and violation of the Illinois Consumer Fraud and Deceptive Business Practices act have resulted in damages to DeEnterprises in an amount to be determined at trial.

95.     On information and belief, Viking's Conduct has been willful, deliberate, intentional, and in bad faith.

96.     By virtue of its Conduct and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Viking has caused and continues to cause irreparable harm to DeEnterprises including, but not limited to, a loss of customers and reputational harm. DeEnterprises has no adequate remedy at law.

## COUNT II
### (Fraud)

97.     DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 95 of this Complaint as set forth fully herein.

98.     Viking's Conduct included misrepresentations, false statements of material fact, and provisions of false videos.

99.     On information and belief, Viking knew that its representations, statements of material fact, and videos were false.

100.     Viking engaged in its Conduct with the intent that DeEnterprises would rely on it, and thus would induce DeEnterprises to enter into the Original Contract to purchase a sachet machine, and the subsequent First Change Order and Second Change Order for the machine.

101.     DeEnterprises justifiably relied on Viking's representations, statements of material fact, and videos.

102.     Viking's Conduct and fraud have resulted in damages to DeEnterprises in an amount to be determined at trial.

103.     On information and belief, Viking's misrepresentations, false statements of material fact, and provisions of false videos have been willful, deliberate, intentional, and in bad faith.

104.     By virtue of its Conduct and fraud, Viking has caused and continues to cause irreparable harm to DeEnterprises including, but not limited to, a loss of customers and reputational harm.  DeEnterprises has no adequate remedy at law.

## COUNT III
## (Breach of Fiduciary Duty)

105.     DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 103 of this Complaint as set forth fully herein.

106.     Prior to and during the Process, DeEnterprises expressly told Viking that DeEnterprises had no relevant design, sourcing, testing, automation, or manufacturing experience and that DeEnterprises would be relying completely on Viking's purported experience, qualifications and abilities for the entire Process in order to provide a sachet machine in accordance with represented specifications.  DeEnterprises' *sole* contribution to the project was to state that it wanted an automated machine to make sachets with its creams, gels, and granular powder in accordance with the identified specifications, and completely relied on Viking for everything.

107.     Viking represented that it had the necessary experience, qualifications and abilities to handle the entire Process start to finish including, but not limited to, designing, selecting, specifying, sourcing, testing, and assembling necessary equipment and components in order to provide a sachet packaging machine that would work with all of DeEnterprises' products.

108.     Viking was to act as DeEnterprises' fiduciary to handle the entire Process and protect DeEnterprises from financial overruns.  Viking assured DeEnterprises that it could and

would make its proposed automation work and do so in a timely commercial manner, as detailed in the foregoing paragraphs.

109. Based on DeEnterprises' familiarity with its products, DeEnterprises expressed a concern from the very beginning about Viking being able to provide an automation system that could pump its sugar scrub product into 63mm x 140mm sachet bags. In this regard, DeEnterprises provided Viking with samples of the sugar scrub product so Viking could prove that it could pump the sugar scrub. DeEnterprises was assured by Viking that it was "thorough" in its "testing to make sure that what is promised is delivered," and promised that it could pump the sugar scrub product in accordance with the agreed specifications. Viking repeatedly provided false videos purporting to show that the machine and equipment contained therein worked in an effort to defraud DeEnterprises into accepting a patently defective machine.

110. Viking had a fiduciary duty to protect the interests of DeEnterprises throughout the Process to ensure that the machine, all equipment, and work complied with the Original Contract, First Change Order, and Second Change Order as well as the applicable standards of care including, but not limited to, by specifying, selecting, and sourcing machine components that would perform in accordance with the project specifications, by inspecting and testing pumps and other machine components to ensure that they would perform in accordance with the project specifications, by inspecting and testing the machine and components thereof during assembly to ensure that they would perform in accordance with the project specifications, and to immediately notify DeEnterprises of any breach or failure of performance by any supplier, manufacturer, technician, project manager, or engineer. Viking also had a duty to properly design the machine and analyze its output on behalf of DeEnterprises.

111. Viking did not exercise the care, skill and judgment required of a fiduciary who would handle the entire Process, provide an operable machine in accordance with the agreed specifications, make sure that the work was performed in a timely commercial manner, and protect DeEnterprises from financial overruns.

112. When certain design changes were proposed by Viking for its machine, DeEnterprises expressly asked that Viking inform them whether or not such changes would be feasible to produce the required sachet output per minute and within DeEnterprises' budget. If they were not, and upon Viking's recommendation, DeEnterprises would reject them. Viking continually assured DeEnterprises that Viking could handle the entire Process, the proposed changes to the project were feasible, and the machine could be made to work. This was not true.

113. Specifically, DeEnterprises relied on Viking's analysis: (a) to design a suitable sachet machine, (b) to determine that the pumps it specified were capable of pumping all of DeEnterprises' products (including the sugar scrub), and (c) to identify the number of lanes that would be necessary to produce the required output of bags per minute. Viking did not properly perform its analysis and, as a result, encouraged DeEnterprises to build a four-lane sachet machine that did not work. Viking did not properly perform that analysis and, as a result, encouraged DeEnterprises thereafter to agree to the First Change Order to decrease the number of lanes for the sachet machine from four to three, which Viking represented would still output 90BPM.

114. On information and belief, Viking either knew or should have known that its analyses were either incorrect or not based on reliable information, and failed to inform the DeEnterprises of the same. Even the three-lane machine that Viking subsequently specified and assembled could not operate in accordance with the specifications of the First Change Order or Second Change Order. DeEnterprises relied on Viking's analyses and Conduct to its detriment.

115.     Throughout the entire Process, Viking failed to protect DeEnterprises' interests and, instead of taking approximately eight (8) weeks as promised, it was over fifty-eight (58) weeks before it became clear that Viking was not going to provide a machine in accordance with its representations, warranties, and contractual obligations, let alone provide such a machine in a timely commercial manner.

116.     DeEnterprises would not have committed to the project, but for its reliance on Viking's advice, representations, and warranties.

117.     Throughout the entire process, DeEnterprises relied on Viking's skill and expertise as DeEnterprises had no experience in design or manufacture of this sort, as expressly stated by DeEnterprises to Viking. Viking accepted a special confidential and fiduciary relationship with DeEnterprises. Viking was entrusted with a high degree of control, indeed complete control, over the project and Process, and DeEnterprises placed a high level of trust and confidence in Viking as a fiduciary to look out for the DeEnterprises' best interests. Said aforementioned actions constitute a breach of the fiduciary duty which Viking owed to DeEnterprises.

118.     Viking's Conduct and breach of its fiduciary duties have resulted in damages to DeEnterprises in an amount to be determined at trial.

119.     By virtue of its Conduct and breach of its fiduciary duty, Viking has caused and continues to cause irreparable harm to DeEnterprises including, but not limited to, a loss of customers and reputational harm.  DeEnterprises has no adequate remedy at law.

### COUNT IV
### (Constructive Fraud)

120.     DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 118 of this Complaint as set forth fully herein.

121.    On information and belief, Viking's Conduct included misrepresentations and false statements of material fact.

122.    On information and belief, Viking's misrepresentations and false statements of material fact were made with the intent that DeEnterprises would rely on them, and thus would induce DeEnterprises to enter into the Original Contract to purchase a sachet machine and the subsequent First Change Order and Second Change Order for the machine.

123.    DeEnterprises justifiably relied on Viking's representations and statements of material fact.

124.    Viking's Conduct and constructive fraud have resulted in damages to DeEnterprises in an amount to be determined at trial.

125.    Viking's misrepresentations and false statements of material fact have caused and continue to cause irreparable harm to DeEnterprises.  DeEnterprises has no adequate remedy at law.

126.    By virtue of its Conduct and constructive fraud, Viking has caused and continues to cause irreparable harm to DeEnterprises including, but not limited to, a loss of customers and reputational harm.  DeEnterprises has no adequate remedy at law.

127.    A fiduciary relationship existed and exists between Viking and DeEnterprises.

**COUNT V**
**(Negligent Misrepresentation)**

128.    DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 126 of this Complaint as set forth fully herein.

129.    On information and belief, Viking's Conduct included misrepresentations and false statements of material fact.

130.    On information and belief, Viking's misrepresentations and false statements of material fact were caused, at a minimum, by its carelessness or negligence in ascertaining the truth of its representations and statements.

131.    On information and belief, Viking's misrepresentations and false statements of material fact were made with the intent that DeEnterprises would rely on them, and thus would induce DeEnterprises to enter into the Original Contract to purchase a sachet machine and the subsequent First Change Order and Second Change Order for the machine.

132.    DeEnterprises justifiably relied on Viking's representations and statements of material fact.

133.    DeEnterprises was owed a duty by Viking to accurately communication information regarding all aspects of the Process including, but not limited to: (a) Viking's experience, qualifications and abilities to specify, select, and source necessary materials and equipment, and assemble them into a sachet packaging machine that would work with DeEnterprises' products; (b) the ability of Viking's selected materials and equipment to correctly operate in a sachet packaging machine that would work with DeEnterprises' products; and (c) proposed designs for a sachet packaging machine that would work with DeEnterprises' products.

134.    Viking's Conduct and negligent misrepresentations have resulted in damages to DeEnterprises in an amount to be determined at trial.

135.    By virtue of its Conduct and negligent misrepresentations, Viking has caused and continues to cause irreparable harm to DeEnterprises including, but not limited to, a loss of customers and reputational harm.  DeEnterprises has no adequate remedy at law.

## COUNT VI
## (Wisconsin Deceptive Trade Practices Act – Wis. Stat. Ann. § 100.18)

136.    DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 134 of this Complaint as set forth fully herein.

137.    On information and belief, Viking's Conduct included representations to DeEnterprises and the public both privately and publicly that Viking is a manufacturer of premade pouch packing machines, baggers, and multilane stick pack and sachet packaging machines, and that it has the necessary experience, qualifications and abilities to handle the entire Process and produce the machines in accordance with agreed specifications.  Viking made these and other false assertions, misrepresentations, and false statements of material fact to DeEnterprises and the public as detailed in the foregoing paragraphs.

138.    On information and belief, Viking's false assertions, misrepresentations, and false statements of material fact, and false videos, were untrue, deceptive, and misleading.

139.    On information and belief, Viking's false assertions, misrepresentations, false statements of material fact, and false videos regarding its machines and services were made with the intent to sell sachet machines and induce DeEnterprises to enter into the Original Contract and subsequent First Change Order and Second Change Order, as well as to induce the public to enter into contracts, to purchase machines from Viking.

140.    Viking's false assertions, misrepresentations, false statements of material fact, and false videos regarding its machines and services were made throughout the entire Process, including prior to and during the Original Contract, the First Change Order, and the Second Change Order.

141.    Viking and DeEnterprises did not and do not have a long-standing commercial relationship, and the Original Contract, First Change Order, and Second Change Order between the companies was their first commercial relationship.

142.    On information and belief, DeEnterprises is not the first company to whom Viking made false assertions, misrepresentations, and false statements of material fact, and is not the first member of the public who was fraudulently induced to enter into a contract with Viking to purchase machines.  *See, e.g.,* Ex. D, *Summit Foods, Inc. v. Viking Packaging Techs., Inc.*, No. 3:18-CV-1470-SI, 2018 WL 4690364, at *1 (D. Or. Sept. 28, 2018) ("Plaintiff Summit Foods Inc., ("Summit") brings this case against Viking Packaging Technologies, Inc., ("Viking") alleging various breach of contract, breach of warranty, misrepresentation, and fraudulent inducement claims arising from Plaintiff's purchase of a piece of machinery from Defendant.").

143.    On information and belief, Viking's false assertions, misrepresentations, false statements of material fact, and false videos have been willful, deliberate, intentional, and in bad faith.

144.    Viking's Conduct and violation of the Wisconsin Deceptive Trade Practices Act have resulted in damages to DeEnterprises in an amount to be determined at trial.

145.    By virtue of its Conduct and violation of the Wisconsin Deceptive Trade Practices Act, Viking has caused and continues to cause irreparable harm to DeEnterprises including, but not limited to, a loss of customers and reputational harm.  DeEnterprises has no adequate remedy at law.

## COUNT VII
### (Breach of Contract)

146.    DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 144 of this Complaint as set forth fully herein.

147.    As detailed in the foregoing paragraphs, DeEnterprises entered into the Original Contract and subsequent First Change Order and Second Change Order whereby Viking agreed to handle the entire Process and deliver a sachet machine that would output 90 bags per minute of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes.

148.    DeEnterprises performed in accordance with the Original Contract, First Change Order, and Second Change Order by providing product samples including creams, gels, and granular powder to be tested for insertion into sachet bags and by making payments as promised.

149.    Viking has breached the Original Contract, First Change Order, and Second Change Order by failing to provide a sachet machine that would perform in accordance with the agreed upon specifications, and by failing to provide such a machine in a timely commercial manner.

150.    To the extent that any promise, agreement or term in the Original Contract, First Change Order, or Second Change Order is ambiguous, the preferred meaning is the one that works against the interests of the party who provided the wording (*i.e.,* Viking) and in favor of the party who did not draft the contract (*i.e.,* DeEnterprises) in accordance with the doctrine of contractual interpretation of *contra proferentem* a/k/a "interpretation against the draftsman."

151.    Viking has failed to cure its breach and has continued to stall and delay its performance.

152.    Given the complete breach of Viking's agreement with DeEnterprises, the terms and conditions of the Original Contract, First Change Order, and Second Change Order are deemed to be null and void.

153.    Viking's Conduct and breach of contract have resulted in damages to DeEnterprises in an amount to be determined at trial.

154.     As a result of Viking's breach of contract, DeEnterprises is currently attempting—in accordance with 810 ILCS 5/2-712 to "cover" by making in good faith and without unreasonable delay a reasonable purchase of or contract to purchase an alternative sachet machine in substitution for the sachet machine due from Viking, and will further seek in damages the difference between the cost of the cover and the final price under the Second Change Order together with any incidental or consequential damages.

155.     On information and belief, Viking's breach of contract was willful, deliberate, intentional, and in bad faith.

156.     By virtue of its Conduct and breach of contract, Viking has caused and continues to cause irreparable harm to DeEnterprises including, but not limited to, a loss of customers and reputational harm.  DeEnterprises has no adequate remedy at law.

## COUNT VIII
### (Breach of Express Warranty – 810 ILCS 5/2-313)

157. DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 155 of this Complaint as set forth fully herein.

158. Viking provided an express warranty under the Original Contract based on its affirmations of alleged fact, promises, descriptions, and video regarding its alleged ability to pump DeEnterprises' sugar scrub product, and thus became part of the bargain for the Original Contract, namely that Viking would deliver a sachet machine that would output sufficient quantities of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes. Viking provided the express warranty with the intention of inducing DeEnterprises to enter into the Original Contract.

159. After execution of the Original Contract, Viking provided subsequent express warranties under the First Change Order and Second Change Order based on its affirmations of alleged fact, promises, descriptions, and thus became part of the bargain for the Original Contract, First Change Order, and Second Change Order, namely that Viking would deliver a sachet machine that would output 90 bags per minute of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes. Viking provided the subsequent express warranty with the intention of inducing DeEnterprises to enter into the First Change Order and Second Change Order.

160. In particular, in order to induce DeEnterprises to accept the First Change Order, Viking expressly warranted, *inter alia*, that: "We all wish this had gone smoother from the beginning, but we can salvage this and give you the best solution possible. Automation is the next step for you and we have the right solution." (*See* Ex. E, Email from Viking, p. 37) (emphasis added). Viking further expressly warranted that "[f]irst, we recommend a 100mm x 90mm sachet.

This will allow us to get an 18mm lance down the forming tube, <u>which can run all products</u> <u>including the pink sugar scrub</u>.  Second, using an 18mm lance means we expect right around 30 cycles per minute or <u>90 pouches [sachet bags] per minute of production</u>." (*Id.*) (Emphasis added).

161.     Viking breached its warranty by failing to deliver a sachet machine that would output 90 bags per minute of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes.

162.     The First Change Order and the Second Change Order did not include an integration clause or otherwise attempt to in any way disclaim any express warranty.

163.     The First Change Order expressly recited the "Change Order Terms."  The only "Change Order Terms" were "100% [payment] prior to ship." (Ex. B, First Change Order).



164.     Viking's breach of its express warranty has resulted in damages to DeEnterprises in an amount to be determined at trial.

165.     As a result of Viking's breach of express warranty, DeEnterprises is currently attempting—in accordance with 810 ILCS 5/2-712 to "cover" by making in good faith and without unreasonable delay a reasonable purchase of or contract to purchase an alternative sachet machine in substitution for the sachet machine due from Viking, and will further seek in damages the difference between the cost of the cover and the price under the Second Change Order together with any incidental or consequential damages.

166.     By virtue of its Conduct and breach of express warranty, Viking has caused and continues to cause irreparable harm to DeEnterprises including, but not limited to, a loss of customers and reputational harm.  DeEnterprises has no adequate remedy at law.

**COUNT IX**
**(Breach of Implied Warranty of Fitness for a Particular Purpose – 810 ILCS 5/2-314)**

167.     DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 165 of this Complaint as set forth fully herein.

168.     At the time of contracting, Viking was aware of the particular purpose for the sachet machine and DeEnterprises' need for the equipment.  Viking repeatedly represented that it had the necessary experience, qualifications and abilities to handle the entire Process and provide a sachet packaging machine that would work with all of DeEnterprises' products.

169.     DeEnterprises relied on Viking for the entire Process and deliver a sachet machine that would output 90 bags per minute of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes.

170.     Viking impliedly warranted under the Original Contract, First Change Order, and the Second Change Order that its sachet machine would be fit for the purpose intended by DeEnterprises' needs.

171. Neither the First Change Order nor the Second Change Order included an integration clause or otherwise attempted to in any way disclaim any implied warranty.

172. The First Change Order expressly recited the "Change Order Terms." The only "Change Order Terms" were "100% [payment] prior to ship."



173. Viking breached its warranty by failing to deliver a sachet machine that would output 90 bags per minute of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes.

174. Viking's breach of its implied warranty has resulted in damages to DeEnterprises in an amount to be determined at trial.

175. As a result of Viking's breach of implied warranty, DeEnterprises is currently attempting—in accordance with 810 ILCS 5/2-712 to "cover" by making in good faith and without unreasonable delay a reasonable purchase of or contract to purchase an alternative sachet machine in substitution for the sachet machine due from Viking, and will further seek in damages the difference between the cost of the cover and the price under the Second Change Order together with any incidental or consequential damages.

176.     By virtue of its Conduct and breach of implied warranty, Viking has caused and continues to cause irreparable harm to DeEnterprises including, but not limited to, a loss of customers and reputational harm.  DeEnterprises has no adequate remedy at law.

### COUNT X
### (Contract Rescission - 810 ILCS 5/2-209)

177.     DeEnterprises re-alleges the allegations set forth in Paragraphs 1 through 175 of this Complaint as set forth fully herein.

178.     Viking and DeEnterprises entered into the Original Contract, First Change Order, and Second Change Order whereby Viking agreed to handle the entire Process and deliver a sachet machine that would output 90 bags per minute of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes.

179.     Viking's representation that it could and would handle the entire Process and deliver a sachet machine that would output 90 bags per minute of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes was a misrepresentation regarding a material term of the contract.

180.     Viking's material misrepresentation was intentional, or in the alternative, Viking's material misrepresentation was innocent, but DeEnterprises had the right to rely on that misrepresentation based on the facts alleged in the foregoing Paragraphs.

181.     DeEnterprises relied to its detriment on Viking's misrepresentation.

182.     In the alternative, rescission is an appropriate remedy here based on a mutual mistake where Viking and DeEnterprises were mistaken concerning facts existing at the times of the Original Contract, First Change Order, and Second Change Order, specifically, that Viking had the ability to handle the entire Process and deliver a sachet machine that would output 90 bags per

minute of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes.

183. In the alternative, rescission is an appropriate remedy here based on DeEnterprises' unilateral mistake, where DeEnterprises reasonably relied on Viking's expertise to handle the entire Process and deliver a sachet machine that would output 90 bags per minute of specifically sized sachet bags of DeEnterprises' products of creams, gels, and granular products at the agreed upon weights and volumes, and where Viking knew or should have known that DeEnterprises was relying on a mistaken impression that Viking could perform the foregoing activities.

184. In the alternative, rescission is an appropriate remedy here where the machine Viking assembled is so fundamentally unsuited to the purpose agreed to under the Original Contract, First Change Order, and Second Change Order, that it completely defeats the object of the parties making the contract.

185. Based on Viking's inability to provide a sachet machine that performed in accordance with the specifications set forth in the Contract, DeEnterprises has requested cancellation of the Original Contract, First Change Order, and Second Change Order as well as a refund for all monies paid under the Contract, and thus has proper notification of its intention to rescind and has not engaged in conduct inconsistent with the intention to rescind.

186. DeEnterprises is entitled to restitution in an amount to be determined at trial such that it is placed in the position it was in before entry into the Original Contract, First Change Order, and Second Change Order.

## DEMAND FOR JURY TRIAL

In accordance with the 7th Amendment to the U.S. Constitution, DeEnterprises hereby demands a jury for all issues so triable.


## PRAYER FOR RELIEF

**WHEREFORE**, DeEnterprises respectfully requests that the Court:

1. Enter judgment against Viking for (I) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act pursuant to 815 ILCS 505; (II) Fraud, (III) Breach of Fiduciary Duty, (IV) Constructive Fraud, (V) Negligent misrepresentation, (VI) violation of the Wisconsin Deceptive Trade Practices Act pursuant to Wis. Stat. Ann. § 100.18, (VII) Breach of Contract, (VIII) Breach of Express Warranty pursuant to 810 ILCS 5/2-313, (IX) Breach of Implied Warranty of Fitness for a Particular Purpose pursuant to 810 ILCS 5/2-314, and (X) Contract Rescission;

2. Award monetary damages sustained and to be sustained by DeEnterprises as a result of Viking's unlawful activities, in an amount to be determined at trial, including, but not limited to: a refund of all monies paid by DeEnterprises as well as its direct damages, consequential damages, cover damages, incidental damages, lost profits, and any other damages allowed by law;

3. Award enhanced and punitive damages against Viking;

4. Award DeEnterprises its attorney's fees for bringing and prosecuting this action;

5. Award DeEnterprises its costs and expenses incurred in bringing and prosecuting this action;

6. Award DeEnterprises prejudgment interest;

7. Preliminarily and permanently enjoin Viking, its officers, directors, agents, employees, attorneys, successors, and assigns, and all others in active concert or participation with any of them, from directly or indirectly shipping to or attempting to force DeEnterprises accept any sachet machine that does not perform in accordance with the contracted specifications including, but not limited to, outputting 90 bags per minute of the contracted sachet bag sizes containing DeEnterprises' gels, creams, and granular products at the contracted weights and volumes; and

8. Award such further and additional relief as this Court deems just and proper.

DATED: October 1, 2019

Respectfully submitted,

/s/ Timothy C. Meece

Timothy C. Meece
Banner & Witcoff, Ltd.
71 S. Wacker Dr.
Suite 3600
Chicago, IL 60606
Telephone: (312) 463-5000
Facsimile: (312) 465-5001
tmeece@bannerwitcoff.com

***Attorney for Plaintiff,***
***DeEnterprises, Inc.***

## EXHIBIT LIST

Exhibit A      Original Contract dated August 9, 2018.

Exhibit B      First Change Order contract dated October 10, 2018.

Exhibit C      Second Change Order contract dated October 26, 2018

Exhibit D      *Summit Foods, Inc. v. Viking Packaging Techs., Inc*., No. 3:18-CV-1470-SI, 2018 WL 4690364 (D. Or. Sept. 28, 2018).

Exhibit E      Chronological Compilation of Exemplary Emails between Viking and DeEnterprises with Annotations

Exhibit F      Excerpt from the "First-Time Buyer" page on Viking's web site (https://vikingmasek.com/packaging-machines/first-time-buyers)

Exhibit G      Excerpt from the "Innovative Machinery" page on Viking's web site (https://vikingmasek.com/about-us/innovative-packaging-machinery-and-technology)